MCGUIREWOODS LLP
William H. Kiekhofer, III, SBN # 94022
wkiekhofer@mcguirewoods.com
Payam Khodadadi, SBN #239906
pkhodadadi@mcguirewoods.com
1800 Century Park East, 8th Floor
Los Angeles, CA 90067-1501
Telephone: (310) 315-8200
Facsimile: (310) 315-8210

Attorneys for AutoPartSource LLC

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| In re | Bankruptcy Case No.: 13-bk-41028 |
| STEPHEN CHARLES BRUTON, | Chapter 7 |
| Debtor. | Adv. Proc. No.: _____ |
| AUTOPARTSOURCE LLC, | **COMPLAINT FOR DETERMINATION OF NON-DISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. §§ 523(a)(2) AND (a)(6)** |
| Plaintiff, | |
| v. | **[11 U.S.C. § 523; Fed. R. Bankr. Proc. 4007 and 7001]** |
| STEPHEN CHARLES BRUTON, | |
| Defendant. | |

COMPLAINT FOR DETERMINATION OF NON-DISCHARGEABILITY
OF DEBT PURSUANT TO 11 U.S.C. §§ 523(a)(2) AND (a)(6)

47464636.4

Plaintiff AutoPartSource LLC ("APS"), a creditor in the above-referenced bankruptcy case of debtor Stephen Charles Bruton ("Bruton"), alleges as follows:

## I. <u>PARTIES</u>

1. APS is a limited liability company organized under the laws of Delaware with its principal place of business in Virginia. APS's three limited liability members reside in New Jersey.

2. Bruton is an individual citizen of the State of California.

## II. <u>JURISDICTION AND VENUE</u>

3. This Adversary Proceeding arises under Title 11 of the United States Code (the "Bankruptcy Code"), and arises in and is related to the bankruptcy case of Stephen Charles Bruton, pending in the United States Bankruptcy Court, Northern District of California, Case No. 13-bk-41028 (the "Bankruptcy Case").

4. This Bankruptcy Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a).

5. Venue is proper pursuant to 28 U.S.C. § 1409(a).

6. This Adversary Proceeding alleges causes of action pursuant to 11 U.S.C. § 523(a) to determine the non-dischargeability of the particular debts alleged herein (exceptions to discharge), and, as such, constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(1) and (b)(2)(I).

7. APS consents to the entry of final orders and judgment in this Adversary Proceeding by the Bankruptcy Court.

8. A right to a jury trial does not apply to this Adversary Proceeding and APS does not consent to a jury trial in this Adversary Proceeding.

///
///
///

COMPLAINT FOR DETERMINATION OF NON-DISCHARGEABILITY
OF DEBT PURSUANT TO 11 U.S.C. §§ 523(a)(2) AND (a)(6)

1

### III.     THE BANKRUPTCY CASE

9.      On February 22, 2013, Bruton commenced his Bankruptcy Case by filing a voluntary Chapter 13 petition.

10.     On April 19, 2013, Bruton filed a Notice of Conversion from Chapter 13 to Chapter 7 [Docket No. 26], converting his Bankruptcy Case from Chapter 13 to Chapter 7.

11.     On April 23, 2013, the Bankruptcy Court entered a certain Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors & Deadline [Docket No. 31] (the "Notice").

12.     The Notice provides that the "Deadline to Object to Debtor's Discharge or to Challenge Dischargeability of Certain Debts: 7/22/13" (the "Deadline").

13.     APS has filed this Adversary Proceeding prior to the Deadline.

14.     This Adversary Proceeding is filed timely.

### IV.     BACKGROUND FACTS

#### APS' Business and Competition

15.     APS is an aftermarket automotive parts manufacturer/distributor with distribution centers on both the east and west coasts of the United States.

16.     APS distributes a number of automotive products, including brake systems, brake rotors/drums, cabin air filters and exhausts.

17.     APS is known for its fast turn-around time on orders, allowing its customers to maximize their inventory turns for profitability.  This aspect of APS's business provides it with a competitive advantage in the marketplace.

18.     Since APS's inception in 2004, it has expended significant expense and effort to properly hire, train and support employees, who are tasked with sourcing automotive parts from China in order to deliver such parts to APS's customers in the United States.

19.     APS's sourcing employees are vitally important to its business.

20.     Without the relationships that APS's sourcing employees develop with vendors, APS cannot source parts at a reasonable cost and pass those savings along to its customers.

COMPLAINT FOR DETERMINATION OF NON-DISCHARGEABILITY
OF DEBT PURSUANT TO 11 U.S.C. §§ 523(a)(2) AND (a)(6)

2

21.     Cost and vendor quality are extremely critical in selecting vendors to manufacture parts for certain APS customers.

22.     Due to the unique nature of the services that APS provides and products that APS sells, specific information about contacts, customer needs, price, costs, vendor quality and development of products cannot be recreated from public literature without a significant expenditure of time and effort.

23.     APS has taken reasonable and necessary precautions to protect its confidential information related to contacts, customer needs, price, costs, vendor quality and development of products.

24.     APS states its policies concerning confidentiality of its business information in its Employee Handbook.

25.     All employees, including Bruton, are notified of APS's confidentiality policy contained in its Employee Handbook.

26.     Only APS's employees have access to APS's confidential and proprietary information in its computer system and each employee who is granted access is required to use an individual username and password.  APS further uses usernames to limit proprietary information to certain individuals.

27.     Most hard copies of confidential and proprietary documents are stored in locked rooms and/or cabinets in APS's headquarters in Richmond, Virginia.

28.     Visitors who are not employed by APS must sign-in at the front security desk.  A security system monitors activity within the Virginia headquarters where the confidential information is stored.

29.     In an event where APS has a business purpose to share information with a third party, APS requires the third party to execute a non-disclosure agreement.

///

///

COMPLAINT FOR DETERMINATION OF NON-DISCHARGEABILITY
OF DEBT PURSUANT TO 11 U.S.C. §§ 523(a)(2) AND (a)(6)

3

30.     On April 23, 2004, APS purchased the assets of Qualitee International, a former competitor in the aftermarket undercar industry.

31.     Mitchell Bennett ("Bennett") was the President of Qualitee International at the time of the asset purchase negotiations and Bruton was an employee of such company.

32.     As a result of the asset purchase, Bruton was terminated from Qualitee International and offered the position of Director of Product Development for APS.  He accepted the offer and began working for APS on April 26, 2004.

33.     Bennett voluntarily resigned from his position as President of Qualitee International prior to the asset purchase and began working for his church.

34.     Initially, Bruton's role was limited to the United States.

35.     In Bruton's role as Director of Product Development for APS, Bruton developed business strategies related to parts, including what kinds of parts APS should be developing, what kinds of parts APS should be manufacturing, where APS should be distributing the parts, and to whom APS should be distributing the parts.

36.     In Bruton's role as Director of Product Development for APS, Bruton also developed a product numbering system for APS's brake rotors.  As the Director of Product Development, Bruton was entrusted with critical responsibilities vital to the vitality and profitability of  APS and with critical confidential information concerning APS's confidential and proprietary information, including information related to sales, marketing, pricing, customer contacts, historical customer information, product development and strategic and tactical plans.  Moreover, Bruton became familiar with and involved in managing APS's strategic relationships with critical customers, including but not limited to Intex Auto Parts and NAPA Auto Parts.

37.     A substantial part of Bruton's responsibilities involved creating and updating several worksheets, data sets, guides and other tools that contained highly-sensitive and critical information relating to APS's dealings with its customers dating back to 1985.  These worksheets,

data sets, guides and other tools contained specifications and details to allow APS to build parts to meet its customers' needs.

38.     Bruton was based in APS's Union City, California warehouse, but he traveled several times per year to APS's headquarters in Richmond, Virginia for meetings, and to engage in APS business.

**APS Expanded Bruton's Role to Include Sourcing in China**

39.     In 2010, APS expanded Bruton's role to include sourcing parts in China to obtain a broader product line for its customers.  Before this time, Bruton had never been to China for either personal or business reasons.  APS trained him on how to source a product internationally so that he could fulfill his new job responsibilities.

40.     APS assigned Lili Huang ("Huang"), a Chinese national, to assist Bruton with his China sourcing responsibilities.

41.     Huang had initially been retained by APS earlier in 2010 as a Quality Control Contractor.  At the time Huang was retained, she executed an Agreement with APS agreeing she would not represent any other company while contracted by APS.  A copy of the Agreement is attached hereto as Exhibit "A" and incorporated herein by such reference.

42.     After APS expanded Bruton's role, Huang acted as Bruton's interpreter and guide, and facilitated meetings between Bruton on behalf of APS and APS's current and potential Chinese vendors.

43.     APS first sent Bruton to China in August 2010.  APS sent Bruton on two more trips to China in 2011, and another two in 2012.  During this time period, Bruton and Huang also attended trade shows in the United States and Canada in which Chinese vendors participated.  APS paid Bruton and Huang for all of their travel expenses related to these international trips.

44.     The business purpose for all of these trips was for Bruton to develop knowledge and contacts for the purpose of sourcing parts for APS.

COMPLAINT FOR DETERMINATION OF NON-DISCHARGEABILITY
OF DEBT PURSUANT TO 11 U.S.C. §§ 523(a)(2) AND (a)(6)

5

45.     Since the expansion to China, APS has developed relationships with four brake rotor vendors in China.  One of the vendors with whom APS directed Bruton to develop a relationship was Longkou Fuyuan Foreign Economy ("Fuyuan").

46.     As a result of Bruton's expanded role, he developed on behalf of APS and was given access to additional trade secret, confidential and proprietary information, including but not limited to information about APS's prospective vendors, APS's relationship with current vendors, what parts were made at certain vendors, the quality of the parts made, the pricing for the parts, what vendor parts were then sold to specific APS customers, the selling price for the parts for each customer and whether it was more profitable to manufacture or source certain parts.

**Bruton's Termination from APS**

47.     Bruton's last trip to China as an employee of APS was on or about December 8, 2012, for the Automechanica Trade Show in Shanghai.

48.     Upon Bruton's return from China, he submitted a report to his direct supervisor, David Gonzalez, Vice President of Sales and Marketing ("Gonzalez").

49.     Gonzales was disappointed with Bruton's report because it lacked specificity, and with respect thereto, Gonzales questioned Bruton.

50.     Bruton became defensive with Gonzalez's questions and did not provide Gonzalez with the specific information that Gonzalez had requested about Bruton's activities on his China trip.

51.     Gonzalez suspected that Bruton had not attended the entire trade show, which would explain the reason Bruton was unable to provide a detailed report.

52.     On December 28, 2012, Dwayne Foster, Director of Filters ("Foster), held a conference call facilitated by Huang with NAPA Auto Parts and four of APS's vendors from China.  The purpose of the call was to make arrangements for an upcoming trip to China to visit the vendor factories.

53. Immediately after the call, Huang contacted Foster to advise him that she had started her own business with a friend. The business to which she referred was engaged in the wholesale distribution of automotive parts, and thus competes directly with APS.

54. Huang indicated that she felt guilty and was suffering because of the secret. Huang admitted she did not want to tell Foster about starting the business earlier because she knew Foster would tell her that she was not permitted to engage in the business while acting as a contractor for APS.

55. On this call, Foster did in fact advise Huang that she could not work for another company while working for APS as it would violate her Agreement with APS.

56. Foster then contacted the President of APS, John Amalfe ("Amalfe"), who in turn contacted Bruton to determine what he knew about Huang's new business.

57. Bruton initially denied any knowledge of Huang's new company. Upon further and repeated questioning, Bruton then admitted that he was the friend who had started the business with Huang. Bruton further admitted he did not tell APS about the new business sooner because he needed to continue to collect a paycheck from APS.

58. Bruton advised Amalfe during the call that the third partner in the new business was Mitchell Bennett, the former President of Qualitee International.

59. The business in which Bruton started with Huang and Michael Bennett is BBH Source Group LLC ("BBH").

60. Bruton is the part owner of BBH.

61. BBH's members reside in China, California and Virginia.

62. BBH has offices in both the United States and China and engages in the business of providing wholesale automotive parts, including brake-related products, clutch systems and filters.

63. BBH first registered as a limited liability company on November 30, 2011, while Bruton was an APS employee assigned to develop its China parts – sourcing business, and over one year before Huang and Bruton disclosed its existence to APS.

COMPLAINT FOR DETERMINATION OF NON-DISCHARGEABILITY
OF DEBT PURSUANT TO 11 U.S.C. §§ 523(a)(2) AND (a)(6)

7

64. On December 31, 2012, the Regional Manager of the Union City facility, Alan Moss ("Moss"), met Bruton around 9:00 a.m. (PST). Amalfe was conferenced in to the meeting by phone. Together, Moss and Amalfe terminated Bruton's employment. After the meeting, Moss collected Bruton's laptop, keys, access cards and other company property, allowed Bruton to pack up some of his personal belongings and then escorted him from the building.

65. At the time of his termination, Bruton was earning $90,000 per year, plus bonuses, commissions and benefits. Since August 2011, APS paid Bruton $160,292.80 in compensation, $5,693.16 in benefits, and $36,353.12 in business expenses, including his travel to China. APS further paid Bruton for his accrued but unused vacation totaling $23,749.94 at the time of his termination.

66. APS also ended its contractual relationship with Huang that day. Since August 2011, APS paid Huang $50,509.25 in compensation and reimbursements pursuant to her Agreement.

67. After his termination, Bruton reentered the building shortly after 12:00 p.m. (PST) on December 31 and requested access to the company-owned laptop to verify his accrued vacation. The laptop had already been sealed in a box and placed in the area where UPS packages are processed. Reuben Villarreal ("Villarreal"), Warehouse Manager, escorted Bruton to the UPS processing area, unsealed the box and allowed Bruton to access the laptop while he watched over Bruton's shoulder. This access period lasted no longer than five (5) minutes.

68. When Bruton was finished, Villarreal put the laptop back in the box, resealed it, and placed the sealed box in the UPS processing area.

69. Because December 31, 2012 was New Year's Eve, most of the Union City employees had left the facility earlier than normal. The office officially closed at 5:23 p.m. (PST) and was locked up at that time for the New Year's Day holiday.

COMPLAINT FOR DETERMINATION OF NON-DISCHARGEABILITY
OF DEBT PURSUANT TO 11 U.S.C. §§ 523(a)(2) AND (a)(6)

8

70. Bruton, or someone acting on Bruton's behalf, unsealed the UPS box and accessed Bruton's former company-owned laptop without APS's knowledge or consent again between 2:22 p.m. (PST) to 2:50 p.m. (PST) on December 31 and deleted several electronic files.

71. On January 1, 2013, Bruton's son, Stephen C. Bruton, Jr. ("Bruton, Jr.") used his APS security code to access the then-closed building around 12:55 p.m. (PST), and gave his father access to Bruton's former company-owned laptop without APS's knowledge or consent between 12:59 p.m. and 2:15 p.m. (PST), so that he could delete several electronic files during this access period.

72. The documents Bruton, or someone acting on his behalf, deleted from his former computer contained (i) APS confidential, proprietary and trade secret information and (ii) BBH business documents that had been created during Bruton's employment with APS without APS's knowledge or consent. Bruton (or the person acting on his behalf) deleted these documents without APS's knowledge or consent, and his access to the APS computer was unauthorized.

73. Bruton's laptop was repacked in the UPS box, placed back in the UPS processing area as if it had never been opened after Villarreal resealed it on December 31, 2012, and on January 3, 2013, Bruton's former laptop was processed by UPS and mailed in a sealed box to APS's headquarters in Richmond, Virginia.

74. Thereafter, APS ordered a forensic analysis of Bruton's former laptop which revealed the above-described unauthorized access to and deletion of a vast number of documents between December 28, 2012 and January 1, 2013. Several of these documents contained APS confidential, proprietary and trade secret documents. At least one of the documents was related to invoices for APS's vendor, Fuyuan.

75. Bruton further deleted several of the worksheets, data sets, guides and other tools he created and updated containing highly-sensitive and critical information relating to APS's dealings with its customers. Specifically, Bruton deleted several data sets related to Magneti Marelli, a customer of APS that supplies after-market parts to Chrysler.

COMPLAINT FOR DETERMINATION OF NON-DISCHARGEABILITY
OF DEBT PURSUANT TO 11 U.S.C. §§ 523(a)(2) AND (a)(6)

9

76. APS had to recreate the data sets before it could manufacture the parts for Magneti Marelli, which resulted in a three month delay for Chrysler to roll out a new product line and substantial lost profits for APS.

77. The forensic analysis further showed that Bruton had stored documents taken from his company laptop on two different USB thumb drives, and had accessed those documents from those thumb drives on his company-owned laptop on December 6, 2012 and December 23, 2012.

78. On information and belief, the documents stored on the USB thumb drives by Bruton contain APS confidential, proprietary and trade secret documents.

79. On information and belief, the thumb drives (or the data stored thereon) are still in Bruton's possession, custody or control.

80. The forensic analysis also revealed invoices, price quotes and comparisons, financial records and other documents related to BBH, reflecting that Bruton used his APS company-owned laptop for BBH.

81. Skype chats between Bruton and Huang were also recovered during the forensic analysis. Among other things, these Skype chats show that Bruton and Huang planned to start BBH as early as August 2011, that they intended to use their relationships with APS and APS's goodwill and reputation to generate business for BBH, that Bruton tried to direct APS to purchase parts from factories where BBH would receive a commission, and that Bruton and Huang discussed as early as December 2011 how to delete documents from APS's computers to hide their involvement with BBH and intentionally harm APS.

**The New Business Competes Directly with APS**

82. After the terminations, Amalfe contacted Bennett to discuss the new business. Bennett acknowledged that as they started the new business, and that he, Bruton and Huang had discussed whether they should notify APS and decided against it because they knew APS would terminate both Bruton and Huang.

83.     Since being told about the new business, APS has learned and alleges on information and belief that Bruton, Huang and Bennett planned to start BBH as early as August 22, 2011.  At such time, Huang and Bruton discussed a plan over Skype in which Bennett would meet with a potential brake rotor supplier and promised the supplier a new customer (APS) in exchange for a 3% commission.  Bruton would then change all of APS's brake rotor business in the local area to the supplier and the commission received by Bennett as a result of APS's business would be used to capitalize BBH.

84.     BBH competes with APS in the business of wholesale distribution of automotive parts, and specifically, BBH sells premium brake rotors.

85.     Both Bruton and Huang have (apparently by mistake) submitted expense reports to APS on a form created by APS, but under the BBH logo.  Thus, Bruton already has used at least one APS internal document to assist him in the new business.

86.     For over 18 months before his termination, Bruton had been traveling to China at APS's expense and arranging his own meetings with APS's vendors on behalf of BBH.  During this time, Huang had been facilitating these meetings for Bruton.

87.     In January 2012, BBH sourced brake rotors from Fuyuan, which is one of the vendors in China with whom APS sent Bruton to meet and establish a relationship on behalf of APS.  Bruton caused Fuyuan to ship the brake rotors directly to one of APS's customer, Intex Auto Parts for the account of BBH.  Over the course of 2012, BBH sourced several other parts from Fuyuan directly to Intex Auto Parts for the account of BBH.  Though APS had sent Bruton to China to form the relationship with Fuyuan on its behalf, BBH, rather than APS received any profit or other sums of money from the Fuyuan parts shipped to Intex.  Already in 2013, Intex Auto Parts has purchased substantially less parts from APS than it had in the first few months of 2012 or any of the preceding years.

88.     In April 2012, APS sent Bruton to China to meet with a vendor regarding sensors. APS compensated Bruton for his analysis of the sensor vendor's product quality and the vendor's

Case: 13-04111    Doc# 1    Filed: 05/23/13    Entered: 05/23/13 11:33:23    Page 12 of
21

manufacturing capabilities, and further paid for all of Bruton's travel expenses. BBH, rather than APS, is now selling the sensor vendor's products, according to BBH's website.

89. Bruton failed to fully attend the Automechanica Trade Show in Shanghai in December 2012, despite APS's direction to do so and in stark contrast to Bruton's assurances that he did indeed attend the entire show. Rather, Bruton used a substantial portion of the December Shanghai trip to meet with potential textile vendors on behalf of BBH.. As a result of Bruton's misrepresentation that he attended the entire trade show, APS covered all of Bruton and Huang's business expenses related to this trip.

90. Bruton deliberately and intentionally used APS's trade secret, confidential and proprietary information related to current and prospective vendors, the quality of their products, cost and pricing, and historical sales to customers to contract with APS vendors and potential vendors to benefit himself and BBH (a secret and unauthorized competitor of APS). In so doing, Bruton intended to harm APS because APS and BBH compete to source and sell substantially the same products. Indeed, Bruton and BBH have essentially hijacked APS's vendor relationships while Bruton continued to collect his APS paycheck for a year and a half. The actions of Bruton and BBH were willful, malicious, and reflect a conscious disregard for the rights of APS, and taken with the full knowledge and intent that such actions would injure APS.

**Bruton's Deliberate and Intentional Wrongful Actions**

91. To the extent not alleged hereinabove, during Bruton's employment with APS, Burton (a) started and engaged in a business that competes with APS while still employed by APS; (b) attempted to fund the competing business with commissions earned as a result of sourcing contracts, customers relationships and business decisions he made on behalf of APS; (c) misappropriated APS's confidential, proprietary and trade secret information; (d) used APS property for his own competitive advantage without APS's authorization; (e) deleted APS proprietary documents without authorization in an effort to cause APS to lose its business

Case: 13-04111    Doc# 1    Filed: 05/23/13    Entered: 05/23/13 11:33:23    Page 13 of 21

opportunities with customers; and (f) solicited contractors to breach their contractual obligations to APS to join a competitive enterprise.

92. APS afforded Bruton broad access to trade secret, confidential and proprietary information, under circumstances giving rise to a duty to maintain their secrecy and limited use.

93. APS's trade secret, confidential and proprietary information has independent and economic value to APS by virtue of the fact that it is not generally known to, or readily ascertainable by, others in the industry that might benefit from such information's use.

94. Bruton willfully, deliberately, intentionally and improperly used, disclosed, disseminated or otherwise transferred or shared APS's trade secrets, confidential or proprietary information to third parties without authority and without APS's knowledge or consent.

95. Bruton deliberately and intentionally used or otherwise accessed APS's computers and/or computer networks to make unauthorized copies of, take, or otherwise obtain or transfer computer data, computer programs and/or software belonging to APS, without APS's knowledge or consent.

96. Bruton deliberately and intentionally used and/or accessed computers and/or computer networks to permanently remove, alter, erase, destroy, damage or otherwise disable computer data, computer programs and/or computer software belonging to APS without authority and without APS's knowledge or consent.

97. Bruton deliberately and intentionally and without permission or authority took or destroyed the intellectual property of APS.

98. Bruton deliberately and intentionally, by any false or fraudulent representation or pretense, defrauded APS of money, labor and/or personal property.

99. Bruton's actions were taken intentionally, deliberately, purposefully and without lawful justification.

COMPLAINT FOR DETERMINATION OF NON-DISCHARGEABILITY
OF DEBT PURSUANT TO 11 U.S.C. §§ 523(a)(2) AND (a)(6)

13

# V. CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Non-Dischargeability of Debt Pursuant to 11 U.S.C. 523(a)(2)

100.    APS incorporates each and every allegation contained above, as if fully set forth herein.

101.    Since at least since 2011, Bruton either intentionally and deliberately made false or misleading representations to, or, concealed his true intentions from, APS in connection with his employment at APS.  During this time period, Bruton received compensation, benefits and reimbursement of expenses.

102.    Bruton made false or misleading representations or statements and/or concealed material facts at a time he knew such representations or statements to be false or misleading or concealed facts that he should have disclosed to APS, with the intent of deceiving APS.

103.    APS, not knowing or having any reason to know of Bruton's false or misleading representations or statements and/or concealment, justifiably relied on such representations and statements and/or lacked knowledge of the materially concealed facts.

104.    As a direct and proximate result of Burton's actions alleged herein, APS has suffered damages, in an amount to be determined, because Bruton received compensation, benefits and reimbursement of expenses from APS.

105.    As further direct and proximate result of Burton's actions alleged herein, APS has suffered damages and continues to suffer damages, in an amount to be determined, including but not limited to lost profits, loss of business, loss of trade, loss of goodwill, and damage to its reputation.

106.    Bruton's liability to APS, in an amount to be determined, arises from actions by which he obtained money, property or services by false pretenses, false representation or actual fraud, and, therefore, constitutes a debt that is excepted from discharge (is non-dischargeable) pursuant to 11 U.S.C. § 523(a)(2).

## SECOND CAUSE OF ACTION

### Non-Dischargeability of Debt Pursuant to 11 U.S.C. 523(a)(6)

107.    APS incorporates each and every allegation contained above, as if fully set forth herein.

108.    Bruton willfully and maliciously injured APS or property of APS by intentionally, deliberately and improperly using, disclosing, disseminating or otherwise transferring or sharing APS's trade secrets, confidential or proprietary information to third parties without authority and without APS's knowledge or consent.

109.    Bruton willfully and maliciously injured APS or property of APS by intentionally and deliberately using or otherwise accessing APS's computers and/or computer networks to make unauthorized copies of, take, or otherwise obtain or transfer computer data, computer programs and/or software belonging to APS without authority and without APS's knowledge or consent.

110.    Bruton willfully and maliciously injured APS or property of APS by intentionally and deliberately using and/or accessing APS's computers and/or computer networks to permanently remove, alter, erase, destroy, damage or otherwise disable computer data, computer programs and/or computer software belonging to APS without authority and without APS's knowledge or consent.

111.    Bruton willfully and maliciously injured APS or property of APS by intentionally and deliberately inducing, aiding and encouraging Huang to breach her contractual obligations with APS and persuading Huang to facilitate meetings for Bruton on behalf of BBH in China and/or with Chinese vendors.

112.    Bruton willfully and maliciously injured APS or property of APS by intentionally, deliberately and improperly using APS's confidential and proprietary information to contact various vendors in China, including Longkou Fuyuan Foreign Economy, and customers, including Intex Auto Parts, other than for the benefit of APS, with the willful and malicious intent to injure APS and interfere with APS's relationships and business expectancy with these vendors.

COMPLAINT FOR DETERMINATION OF NON-DISCHARGEABILITY
OF DEBT PURSUANT TO 11 U.S.C. §§ 523(a)(2) AND (a)(6)
15

113. Bruton willfully and maliciously injured APS or property of APS after his termination by intentionally and deliberately conspiring with Bennett and Huang to directly compete with APS using APS's intellectual property, business relationships and misappropriating revenues for the benefit of their jointly owned competitor, BBH.

114. Bruton's actions were wrongful acts, were done intentionally, were without just cause or excuse and necessarily caused injury to APS.

115. As a direct and proximate result of Burton's actions alleged herein, APS has suffered damages and continues to suffer damages, in an amount to be determined, including but not limited to lost profits, loss of business, loss of trade, loss of goodwill, data recreation costs, and damage to its reputation.

116. Bruton's liability, in an amount to be determined, arises from actions by which he willfully and maliciously injured APS and or property of APS, and, therefore, constitutes a debt that is excepted from discharge (is non-dischargeable) pursuant to 11 U.S.C. § 523(a)(6).

## VI. PRAYER FOR RELIEF

WHEREFORE, APS prays for judgment as follows:

1. Determining the existence and amount of Bruton's liability to APS;

2. Declaring that Bruton's liability to APS, in an amount to be determined, is excepted from discharge (is non-dischargeable) pursuant to 11 U.S.C. § 523(a)(2) and/or (6);

3. Granting a non-dischargeable judgment in favor of APS and against Bruton, in an amount to be determined, including without limitations, pre-judgment and post-judgment interest as provided by law, reasonable attorneys' fees, costs and expenses; and

///
///
///
///

COMPLAINT FOR DETERMINATION OF NON-DISCHARGEABILITY
OF DEBT PURSUANT TO 11 U.S.C. §§ 523(a)(2) AND (a)(6)

16

1       4.      Awarding such other and further relief as the Bankruptcy Court deems just and

2   proper.

3   DATED: May __, 2013                     MCGUIREWOODS LLP

4

5                                           By:  /s/ Payam Khodadadi
                                                 William H. Kiekhofer, III
6                                                Payam Khodadadi
                                                 Attorneys for AutoPartSource LLC
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
COMPLAINT FOR DETERMINATION OF NON-DISCHARGEABILITY
OF DEBT PURSUANT TO 11 U.S.C. §§ 523(a)(2) AND (a)(6)
17

**EXHIBIT "A"**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COMPLAINT FOR DETERMINATION OF NON-DISCHARGEABILITY
OF DEBT PURSUANT TO 11 U.S.C. §§ 523(a)(2) AND (a)(6)



This Agreement made this 25th day of January 2010 by and between AutoPartSource LLC and Lili Huang (Representative) to contract Lili Huang as a representative of AutoPartSource in China. Representative is not to represent any other company while contracted by AutoPartSource. This contract is for a minimum of a 40 hour work week beginning January 25, 2010 . AutoPartSource requires that representative supply a weekly report of projects worked each 40 hour week period. AutoPartSource will compensate representative on a monthly basis of $ 1,000 USD per month for representative's work. AutoPartSource will use the weekly report supplied by the representative as an invoice for compensation purposes. Representative is to work from a home office in Dong Guan City (which is the city where PVI and Luao Filter Company are located). Representative will be compensated for travel expenses when representative travels outside of Dong Guan City to visit a factory, AutoPartSource or other business related travel at the request of AutoPartSource. Compensation for these travel expenses will be paid from a completed expense report that will be supplied by AutoPartSource and filled out by representative.

Duties of this contract will be but not limited to:
1. Assistance with AutoPartSource employees, and or customers of AutoPartSource while staying and or traveling in China. Including but not limited to arranging accommodations and scheduling travel, plant tours and meetings.
2. Visiting the factories in China on a regular basis and reporting findings to AutoPartSource.
3. Working with AutoPartSource employees and the factories to resolve any issues or help with any project that pertains to AutoPartSource.
4. Visiting the factories and or raw material suppliers to the factories on a regular basis but also at the request from the factory or AutoPartSource to review production and assure quality control (including but not limited to measuring parts to drawings) and report findings to AutoPartSource.
5. Traveling to the AutoPartSource main office in Richmond, Virginia for training and meetings as requested.
6. Finding and or working with potential new factories under the direction of AutoPartSource.
7. Phone calls or meetings with AutoPartSource to review activities or projects we are working on.

Representative will work with our current factories and any new or potential new factories under AutoPartSource direction to resolve any issues, concerns or research with product, production, packaging, timing of orders, new product development, drawings, paperwork, PPAP process, etc. that is needed.

Representative will work on the Chinese work and holiday schedule. This contract's initial term will have a 90 day probation period. After that 90 day probation period unless

EXHIBIT "A"

this contract is terminated it will be for one year and will automatically renew after one year unless otherwise changed or terminated. Termination of this contract may also be necessary based on a violation of this agreement, poor performance or economic conditions.  If termination of this contract is necessary for any reason a 30 day written notice will be given.

By singing this contract AutoPartSource agrees to supply Representative with the training, information and tools needed to honor this contract to the best of representative's abilities.

By signing this contract Representative agrees to perform the duties of this contract to the best of representative's ability.  Representative also agrees to keep strictly confidential any sensitive, customer or factory information, etc. that may be shared with representative.  The information regarding customers, factories or any other business between AutoPartSource, it's factories, customers and or Representative is strictly confidential and is not to be shared or discussed with factories, customers or others that may damage or hurt AutoPartSource as a  business or its business relationships.

Representative Signature

Representative Printed Name _____Lili Huang_____

AutoPartSource Representative _____Dwayne Fu_____

EXHIBIT "A"